**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

***(FILED UNDER PROTEST AND SOLELY TO PRESERVE PLAINTIFFS' RIGHTS WHILE MOTION TO REMAND REMAINS PENDING)***

| | | |
|---|---|---|
| **GERALD CONWAY, HAYDEN JOHNSON, MELISSA MCGUIRE, ROBERT ROWLAND, ANDREW WILLIAMS, and DOMONIQUE WILSON, on behalf of themselves individually and all others similarly situated,** | § | |
| | § | **CLASS ACTION** |
| ***Plaintiffs*,** | § | |
| | § | **CASE NO. 4:25-CV-04980** |
| **v.** | § | |
| **GREYSTAR REAL ESTATE PARTNERS, LLC; GREYSTAR RS NATIONAL, LLC; GREYSTAR MANAGEMENT SERVICES, LLC; CAMDEN PROPERTY TRUST; CAMDEN OPERATING, L.P.; CAMDEN DEVELOPMENT, INC.; CAMDEN SUMMIT PARTNERSHIP, L.P.; LIVCOR, LLC; CUSHMAN & WAKEFIELD, INC.; PINNACLE PROPERTY MANAGEMENT SERVICES, LLC; CORTLAND MANAGEMENT, LLC; CORTLAND SERVICES, LLC; WILLOW BRIDGE PROPERTY COMPANY, LLC; and REALPAGE, INC.;** | § | |
| ***Defendants.*** | § | |

---

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

---

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 15(a)(1), and solely under protest and without consenting to federal jurisdiction, Plaintiffs Gerald Conway, Hayden Johnson, Melissa McGuire, Robert Rowland, Andrew Williams, and Domonique Wilson, individually and on behalf of a class of similarly situated persons, file this Amended Class Action Complaint (the "Amended Complaint") complaining of Defendant RealPage, Inc. ("RealPage") and Defendants Greystar Real Estate Partners, LLC ("Greystar"), Greystar RS National, LLC, Greystar Management Services, LLC, Camden Property Trust ("Camden"), Camden Operating, L.P., Camden Development, Inc., Camden Summit Partnership, L.P., LivCor, LLC ("LivCor"), Cushman & Wakefield, Inc. ("Cushman & Wakefield"), Pinnacle Property Management Services, LLC ("Pinnacle"), Cortland Management, LLC ("Cortland"), Cortland Services, LLC, and Willow Bridge Property Company, LLC ("Willow Bridge") (collectively, "Management Defendants") (together with "RealPage," "Defendants"). Plaintiffs submit this Amended Complaint within the time permitted by Rule 15(a)(1)(B) following removal, or, alternatively, seek leave under Rule 15(a)(2) to ensure full compliance with federal procedural requirements without conceding jurisdiction. In support thereof, Plaintiffs respectfully show the Court as follows:

## NATURE OF THE ACTION

1. Management Defendants, who are some of the nation's largest landlords, engaged in a collusive scheme and conspiracy with and through RealPage, a Texas-based technology company that designs and markets rental pricing software. Specifically, Defendants conspired to raise rents for Texas tenants above competitive levels in violation of Texas law. This lawsuit seeks to remedy Plaintiffs and the Proposed Class for Defendants' illegal conduct. Specifically, RealPage developed and promoted its "Revenue Management" platform—including its products like YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO")—

ostensibly as tools for landlords to maximize rental revenue. In practice, these tools not only enabled competing property managers and owners to share competitively sensitive data, but also and more importantly implement *coordinated rent increases* across entire metropolitan housing markets, such as the Houston, Dallas–Fort Worth, and Austin metropolitan markets. In reality, Defendants substituted algorithmic recommendations for independent decision-making, and therein created a system in which rents were set not by competition, but by uniform directives designed to inflate prices above competitive levels.

2. At the heart of the scheme, RealPage aggregated confidential data on rents, occupancy, lease renewals, and concessions from multiple competitors and processed that data through its algorithms. It then issued daily rent "recommendations" to participating landlords. But these were not merely recommendations: rather, the landlords were expected to follow these recommendations. To ensure that its landlord clients adhered to these outputs, RealPage tracked compliance, circulated reports, and employed persons as "pricing advisors" whose duty was to drive landlords to follow RealPage's recommendations. Landlords that strayed from the algorithm's recommendations were pressured to provide justifications for deviations, further discouraging independent pricing. In this way, RealPage served as the hub of a hub-and-spoke conspiracy that coordinated pricing decisions among otherwise competing landlords.

3. Each of the Management Defendants knowingly joined and contributed to this arrangement, therein becoming a separate spoke in the conspiracy. They contracted with RealPage, shared their nonpublic data, and adopted internal policies to implement RealPage's recommended rent increases. The combined size and influence of the Management Defendants gave the scheme sweeping impact across Texas's largest housing markets. Tenants in Houston, Dallas–Fort Worth, and Austin routinely faced near-identical rent increases from different landlords during the same

periods, demonstrating that Defendants' conduct was not the product of natural market conditions but of coordinated pricing.

4. The result was predictable and harmful: multifamily rental rates were artificially inflated and stabilized, depriving tenants of competitive housing options, and forcing them to shoulder supracompetitive costs for a basic necessity of life. Plaintiffs and the proposed Class seek relief under Texas antitrust, consumer protection, and common law. They ask this Court to hold Defendants accountable, to award damages and restitution for the inflated rents paid, and to enjoin the continuation of this unlawful collusion that has distorted the Texas rental housing market.

## VENUE AND JURISDICTION

5. Plaintiffs expressly contest this Court's jurisdiction and maintain that this action was improperly removed from Texas state court, where the original class action complaint was filed under the caption *Conway, et al. v. RealPage, Inc., et al.*, Cause No. 2025-71220 in the 55th Judicial District for Harris County, Texas. Plaintiffs file this Amended Complaint solely to comply with Federal Rule of Civil Procedure 15(a) and to preserve their claims without prejudice and under protest while the pending motion to remand remains unresolved.

6. By filing this pleading, Plaintiffs do not consent to federal jurisdiction, waive any procedural or substantive challenge to removal, or concede that venue is proper in this or any federal court. All objections to removal, venue, and subject-matter jurisdiction are expressly preserved.

7. Plaintiffs reiterate that the Texas state court in which this action was filed has proper subject-matter and personal jurisdiction because the amount in controversy exceeds the court's minimum jurisdictional limits and Defendants either reside in or conduct continuous and systematic business in the State of Texas.

8. Venue remains proper in Harris County, Texas under Tex. Civ. Prac. & Rem. Code § 15.002 because all or a substantial part of the events or omissions giving rise to the claims occurred in this county, and because one or more Defendants reside or maintain their principal place of business here.

9. In addition, Plaintiffs have added a claim under the Texas Deceptive Trade Practices–Consumer Protection Act (Tex. Bus. & Com. Code § 17.41 *et seq.*), which arises solely under Texas law and further underscores that this controversy is a localized dispute between Texas consumers and Texas-based defendants. The addition of this purely state-law claim reinforces that remand to Texas state court is both appropriate and required, as the case presents no federal-question basis and falls squarely within the local-controversy and home-state exceptions to CAFA jurisdiction.

10. Upon remand, Plaintiffs will file a conforming amended petition in Texas state court reflecting the additional factual allegations and claims asserted herein.

11. This filing shall not be construed as a waiver of any procedural or substantive objection to removal, jurisdiction, or venue, and is made solely under protest to preserve Plaintiffs' rights and avoid any argument of waiver.

## PARTIES

12. Plaintiff Gerald Conway is an individual residing in Richardson, Texas, in Dallas County in the Dallas metropolitan area. During the relevant period, he rented property in a property managed by Willow Bridge in the Dallas metropolitan area.

13. Plaintiff Hayden Johnson is an individual residing in Austin, Texas in Travis County in the Austin metropolitan area. During the relevant period, he rented property in a property managed by Greystar in the Austin metropolitan area.

14. Plaintiff Melissa McGuire is an individual residing in Madison, Dane County, Wisconsin. During the relevant period, she rented property in a property managed by Greystar in Austin, Texas, in Travis County in the Austin metropolitan area.

15. Plaintiff Robert Rowland is an individual residing in Henderson, Carolina County, Maryland. During the relevant period, he rented property in a property managed by Camden in Katy, Texas in Harris County in the Houston metropolitan area.

16. Plaintiff Andrew Williams is an individual residing in Dallas, Texas, in Collin County in the Dallas metropolitan area. During the relevant period, he rented property in a property managed by Cortland in the Dallas metropolitan area.

17. Plaintiff Domonique Wilson is an individual residing in Houston, Texas, in Harris County in the Houston metropolitan area. During the relevant period, she rented property in a property managed by Greystar in the Houston metropolitan area.

18. Defendant RealPage is a Delaware corporation with its principal place of business in Texas at 2201 Lakeside Boulevard, Richardson, Texas 75082. RealPage may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

19. Defendant Greystar is a Delaware limited liability company with its principal place of business in Charleston, South Carolina. Greystar operates in Texas via entities such as Defendants Greystar RS National, LLC and Greystar Management Services, LLC. Greystar has offices in Texas at 2500 Bee Cave Road, Building III, Suite 500, Austin, TX 78746, 601 State Street, Suite 500, Southlake, TX 76092, 730 Town & Country Boulevard, Suite 800, Houston, TX 77024, and 927 East Sonterra Boulevard, Suite 250, San Antonio, TX 78258. Greystar may be

served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

20. Defendant Greystar RS National, LLC is a Delaware limited liability company with its principal place of business in Charleston, South Carolina. It may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

21. Defendant Greystar Management Services, LLC is a Delaware limited liability company with its principal place of business in Charleston, South Carolina. It may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

22. Defendant Camden is a publicly traded Texas real estate investment trust with its principal place of business at in Houston, Texas. Camden operates in Texas via entities such as Defendants Camden Operating, L.P., Camden Development, Inc, and Camden Summit Partnership, L.P.. Camden may be served with process through its registered agent, Capitol Corporate Services, Inc., 1501 South Mopac Expressway, Suite 220, Austin, Texas 78746.

23. Defendant Camden Operating, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas. It may be served with process through its registered agent, Capitol Corporate Services, Inc., 1501 South Mopac Expressway, Suite 220, Austin, Texas 78746.

24. Camden Development, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. It may be served with process through its registered agent, Capitol Corporate Services, Inc., 1501 South Mopac Expressway, Suite 220, Austin, Texas 78746.

25. Camden Summit Partnership, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas. It may be served with process through its registered

agent, Capitol Corporate Services, Inc., 1501 South Mopac Expressway, Suite 220, Austin, Texas 78746.

26. Defendant LivCor is a Delaware limited liability company with its principal place of business in Chicago, Illinois, and may be served with process through its registered agent, Corporation Service Company d/b/a CSC—Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

27. Defendant Cushman & Wakefield is a New York corporation with its principal place of business in Chicago, Illinois, and may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Cushman & Wakefield owns, operates, and/or manages multifamily rental properties in the state of Texas and elsewhere throughout the United States through its subsidiary, Defendant Pinnacle, under the Cushman & Wakefield name since acquiring Pinnacle in March 2020.

28. Defendant Pinnacle is a Delaware limited liability company with its principal place of business in Addison, Texas. It may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

29. Defendant Cortland is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. Cortland operates in Texas via entities such as Defendant Cortland Services, LLC. Cortland has offices in Texas at, among other places, 14675 Dallas Parkway, Suite 550, Addison, TX 75254 and 1333 West Loop South, Suite 840, Houston, TX 77027. Cortland may be served with process through its registered agent, Corporation Service Company d/b/a CSC—Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

30. Defendant Cortland Services, LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. It may be served with process through its registered agent, Corporation Service Company d/b/a CSC—Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

31. Defendant Willow Bridge is a Texas limited liability company with its principal place of business in Dallas, Texas. It may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## CLASS ACTION ALLEGATIONS

32. Plaintiffs bring this action pursuant to Texas Rule of Civil Procedure 42 on behalf of themselves and all others similarly situated (the "Class").

33. The Class is defined as:

> ***All persons who, during the applicable limitations period, leased multifamily residential real estate in Texas from any Management Defendant and/or paid rent that was set, influenced, or otherwise affected by or using RealPage's revenue management software.***

34. Plaintiffs reserve the right to modify or amend the Class definition during this lawsuit, including but not limited to obtaining evidence during discovery.

35. The members of the Class are so numerous that joinder of all members is impracticable.

36. There are questions of law and fact common to the Class, including but not limited to:

a. Whether Defendants entered into an agreement to fix, maintain, or increase rental prices;

b. Whether Defendants used RealPage's software to coordinate pricing;

c. Whether such conduct violated the Texas Free Enterprise and Antitrust Act;

d. Whether such conduct violated the Texas Deceptive Trade Practices Act; and

e. The appropriate measure of damages.

37. Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class members, were harmed by Defendants' uniform anticompetitive conduct.

38. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in complex class action litigation.

39. This action is maintainable as a class action under Tex. R. Civ. P. 42(b)(3) because common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. For example, even if the damages sustained by individual Class members may vary, this does not preclude certification, because the central issues—focused on whether Defendants engaged in a coordinated pricing scheme using RealPage's software and whether that conduct is unlawful—can be resolved in a single adjudication binding on all members.

## FACTUAL BACKGROUND

### *A. General Description of Defendants and Their Texas Connections*

40. RealPage is a technology and data analytics firm that designs, markets, and operates revenue management and pricing software platforms, including YieldStar, AIRM, and LRO. RealPage aggregates nonpublic leasing and occupancy data from competing landlords, uses proprietary algorithms to generate rental rate and concession recommendations, and promotes adoption of those recommendations through auto-accept features, compliance monitoring, and

advisory services. RealPage's role in the conspiracy is as a facilitator and enabler, coordinating parallel pricing conduct among competing Management Defendants.

41. RealPage maintains substantial, continuous, and systematic contacts with the State of Texas, including maintaining its corporate headquarters, executive offices, and primary operations within the state. From Texas, RealPage develops, markets, licenses, and supports its revenue management and property management software, and directs, controls, and coordinates the conduct that gives rise to the claims asserted herein. RealPage's acts and omissions in Texas were purposefully directed toward customers and markets both within Texas and nationwide, and this litigation arises from and relates to those Texas-based activities. Accordingly, the exercise of personal jurisdiction over RealPage in Texas comports with due process and is authorized by the Texas long-arm statute.

42. Management Defendants are among the largest owners, managers, and operators of multifamily residential rental housing in Texas and throughout the United States. They collectively control tens of thousands of rental units in key metropolitan areas, including Houston, Dallas–Fort Worth, and Austin. Their size, market share, and geographic footprint give them substantial influence over prevailing rental rates in the Texas multifamily housing market.

43. In addition to their significant presence in Texas, Management Defendants participate in national networks and trade associations and operate in multiple competitive markets. Their actions in setting and adjusting rental prices have widespread effects on tenants, competition, and market dynamics.

*B.* *Overview of the Scheme*

44. Beginning no later than 2016 and continuing through the present, Defendants participated in a scheme to artificially inflate and maintain rental prices in violation of Texas

antitrust, consumer protection, and common law. This scheme was implemented primarily through their coordinated adoption and use of RealPage's revenue management and pricing platform ("RealPage RM Platform" or the "RM Platform"), which uses algorithmic tools to recommend uniform rent increases across participating properties.

45. The RealPage RM Platform—encompassing products like YieldStar, AIRM, and LRO among others—served as the central mechanism through which landlords coordinated rental pricing. YieldStar established the foundation by pooling competitor data and issuing uniform rent recommendations; AIRM advanced that model by automating compliance and scaling algorithmic pricing across larger portfolios; and LRO, acquired from another company in 2017, offered lease-term "options" that still steered rents upward while further broadening RealPage's reach. Though branded differently, each product operated on the same principle: replacing independent pricing discretion with algorithm-driven directives based on confidential data shared among competitors. By consolidating these tools into its single RM platform, RealPage created a unified system that aligned landlords' pricing conduct, suppressed competition, and produced supracompetitive rents across millions of housing units nationwide.

46. RealPage markets its RM Platform as a means to maximize rental revenue by sharing nonpublic, competitively sensitive data among competing landlords. The platform collects detailed information from its users, including current rents, occupancy rates, lease renewal data, and historical pricing trends. RealPage aggregates this data from numerous competing landlords—including Defendants—and uses it to generate pricing recommendations designed to push rents higher across the market.

47. But RealPage not only issued daily rent recommendations; it also tracked whether landlords accepted them. RealPage distributed compliance reports and employed "pricing

advisors" who pressured landlords to adhere to its outputs. Landlords that rejected recommendations were required to justify their deviations, therein discouraging independent pricing and reinforcing adherence to algorithmic pricing.

48. RealPage also regularly convened and directed group meetings with YieldStar and AIRM users that competing landlords attended. At these meetings, pricing strategies, concessions, renewals, and responses to market conditions were discussed under RealPage's direction. During the COVID-19 pandemic, for examples, RealPage personnel (in conjunction with the RealPage platform tools) discouraged landlords from reducing rents or offering concessions despite declining demand. Such actions prevented normal market adjustments and maintaining elevated rents even during downturns.

49. The core of the scheme is the exchange of confidential pricing and occupancy information among horizontal competitors (the Management Defendants) through RealPage's centralized system, coupled with a high rate of adherence to the resulting algorithmic recommendations. By relying on RealPage's outputs rather than independent business judgment, Management Defendants reduced or eliminated normal price competition, leading to supracompetitive rents and reduced supply elasticity for tenants.

50. Management Defendants' participation in the RM Platform was not coincidental. Each Management Defendant affirmatively contracted with RealPage, agreed to provide it with their sensitive pricing and leasing data, and adopted internal policies to follow the rent recommendations in most circumstances.

51. The result was predictable: rental rates across Management Defendants' properties increased in parallel and often exceeded market rates that would have prevailed in a competitive environment. This pattern held true across multiple Texas metropolitan areas, as tenants renting

from different Defendants experienced nearly identical rent increases during the same periods. Examples are detailed below.

52. Notably, the United States Department of Justice, has investigated RealPage and its participating landlords—including Management Defendants—for this and related conduct and concluded that these entities entered into agreements and engaged in concerted action to restrain trade and fix rental prices. *See, e.g.,* Amended Complaint, *United States, et al. v. RealPage, Inc., et al.*, Case No. 1:24-cv-00710-LCB-JLW (M.D.N.C., Jan. 7, 2025) (ECF No. 47) (the "DOJ Complaint").[1] In particular, the Department of Justice has emphasized that RealPage controls roughly 80% of the revenue management software market nationwide and wields especially high levels of control in metropolitan areas such as Dallas, Houston, and Austin. This allows RealPage and participating landlords to exert dominant influence over prevailing rent levels. Such findings are consistent with Plaintiffs' allegations herein and confirm the existence of the coordinated pricing scheme.

*C. Defendants' Knowledge and Intent*

53. Defendants understood that the RealPage RM Platform relied on pooling sensitive data from competitors and that its effectiveness depended on widespread adherence to its recommendations. Defendants also knew that following these recommendations would result in higher rents than would otherwise prevail.

54. Defendants knowingly and voluntarily joined this arrangement because it offered a means to increase profits without the risk of losing tenants to lower-priced competitors—since those competitors were using the very same system and following the same recommendations.

[1] Available at https://www.justice.gov/archives/opa/media/1383316/dl?inline. Plaintiffs incorporate all allegations detailed in the DOJ Complaint herein.

55. Internal RealPage documents and public marketing materials touted the platform's ability to encourage landlords to outperform the market and achieve rent increases even in periods of high vacancy or low demand.

56. By agreeing to use RealPage's system and follow its pricing outputs, Defendants entered into a continuing combination and conspiracy with the purpose and effect of fixing, maintaining, and increasing rental prices in Texas.

*D. Impact on Tenants and Competition*

57. The scheme harmed tenants by depriving them of competitive rental options and forcing them to pay inflated prices for housing—a necessity of life. Tenants who might otherwise have been able to negotiate lower rents or shop for better deals were confronted with artificially uniform pricing across competing properties. That is, through this scheme, Defendants rendered tenants for all intents and purpose unable to find better prices at different properties—as is usual and typical in the housing market.

58. Tenants reasonably relied on the assumption that each landlord independently set rental prices based on market supply and demand. Defendants' concealment of their coordinated use of RealPage's shared data deprived tenants of material information directly affecting their rental decisions.

59. As a result of the scheme, competition among Defendants for tenants in the relevant markets was substantially reduced or eliminated. In a competitive market, landlords independently set rents based on their own costs, supply, demand, and business strategies. Under the RealPage system, those independent decisions were replaced by coordinated adherence to algorithmic recommendations derived from competitors' data.

60. The economic impact of algorithmic price coordination is large and measurable. A December 17, 2024 analysis by the White House Council of Economic Advisers (the "CEA Analysis") found that renters in algorithmically priced buildings paid an average of $70 more per month in 2023, totaling an estimated $3.8 billion in excess rent nationwide.[2] Specifically, the CEA Analysis noted that in the Dallas–Fort Worth metropolitan area, renters in RealPage-linked units paid about $132 more per month on average in 2023.[3] And in the Houston metropolitan area, renters in RealPage-linked units paid about $83 more per month on average in 2023.[4]

61. Additionally, the DOJ Complaint identifies Austin among metropolitan areas where there has been substantial adoption of RealPage's algorithmic pricing. Specifically, RealPage contracts with dozens of major landlords—among them Greystar and Camden—who operate extensively in the Austin metropolitan area—indicating significant local market penetration. Independent analysis by *The Washington Post* estimates that at least 12% of multifamily units nationwide—and notably higher shares in metros like Austin—are managed by firms alleged to use RealPage's rent-setting tools." Further, according to an independent analysis by KUT 90.5, Austin's local NPR affiliate, six landlords named in the DOJ complaint—Greystar, LivCor, Camden, Cushman & Wakefield (and Pinnacle), Willow Bridge, and Cortland—own or manage at least 52,715 rental units in the Austin–Round Rock metropolitan area.[5] This exposes tens of thousands of renters to the effects of RealPage-facilitated coordinated pricing.

---

[2] Council of Economic Advisers, Exec. Office of the President, *The Cost of Anticompetitive Pricing Algorithms in Rental Housing* (Dec. 17, 2024), https://bidenwhitehouse.archives.gov/cea/written-materials/2024/12/17/the-cost-of-anticompetitive-pricing-algorithms-in-rental-housing/.

[3] *See* CEA Analysis; *see also* Emily Peck & Tasha Tsiaperas, *RealPage software raises Dallas-area rents, report finds*, AXIOS DALLAS (Dec. 18, 2024), available at https://www.axios.com/local/dallas/2024/12/18/realpage-software-dallas-rent-market.

[4] *See* CEA Analysis; *see also* Emily Peck & Jay R. Jordan, *Pricing software raises Houston-area rent, report finds*, AXIOS HOUSTON (Jan. 6, 2025), https://www.axios.com/local/houston/2025/01/06/realpage-rent-prices-doj-lawsuit

[5] *See* Audrey McGlinchy, *DOJ Lawsuit Says Landlords Colluded to Inflate Rents. Here's What That Means for Austin*, KUT (Jan. 17, 2025), available at https://www.kut.org/housing/2025-01-17/department-of-justice-antitrust-lawsuit-realpage-austin-tx-landlords-tenants.

62. All of the supracompetitive rent mark-ups, including but not limited to those detailed above, were persistent and imposed significant monetary burdens on hundreds of thousands of Texas renters.

*E. Conspiracy Allegations Under Texas Antitrust Law*

63. Defendants' coordinated use of RealPage's revenue management software constitutes a conspiracy in violation of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.05(a) and (c). Section 15.05(a) provides: "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful." Section 15.05(c) further declares it unlawful for "competitors to agree to fix, maintain, increase, or reduce the price of goods or services." By collectively adopting and using RealPage's platform, exchanging otherwise confidential rental rate data, and agreeing—expressly or tacitly—to follow pricing recommendations generated by RealPage, Defendants have engaged in concerted action with the unlawful objective of fixing, maintaining, and increasing multifamily rental prices in Texas and other markets. This conduct amounts to *per se* illegal price-fixing because it eliminates independent pricing discretion and replaces it with coordinated, algorithm-driven pricing uniformity that artificially inflates rents.

64. RealPage's revenue management platform relies on the sharing of nonpublic, competitively sensitive rental information from participating landlords, including current pricing, occupancy, and lease renewal data. Defendants agreed to provide such data into a common pool managed by RealPage and to receive in return "recommendations" that reflected aggregated market intelligence from competitors. Defendants then used these recommendations to set their own prices, leading to synchronized rent increases across competing properties.

65. This alignment in pricing was not the result of natural market forces, but rather the product of deliberate coordination facilitated by RealPage's platform. By agreeing to a system that discouraged price competition and encouraged uniform rate increases, Defendants knowingly participated in an unlawful combination and conspiracy to restrain trade.

66. The effect of this conspiracy has been a substantial suppression of price competition in the Texas multifamily rental market. Tenants were deprived of the benefits of competitive pricing, faced artificially inflated rental rates, and suffered financial harm in the form of unnecessarily increased housing costs.

67. The conduct alleged herein also demonstrates the mutual awareness and conscious commitment to a common scheme among Defendants. Their participation in RealPage's program was not isolated; rather, it was reinforced through communications, benchmarking, and ongoing adherence to algorithmic recommendations that would be irrational in a truly competitive market.

68. Defendants' conspiracy has harmed not only the named Plaintiffs and the proposed Class members, but also competition itself. The market wide impact of Defendants' conduct is precisely the type of injury the Texas Free Enterprise and Antitrust Act was designed to prevent.

69. Defendants' coordinated conduct through RealPage's platform was not an isolated or coincidental practice. Instead, Defendants collectively adopted and adhered to RealPage's rental pricing recommendations, which were based on aggregated, sensitive, non-public rental data from competing property owners and managers available only through RealPage. This conduct ensured that rental prices across competing properties would remain at artificially elevated levels.

70. RealPage's RM platform, including its YieldStar, AIRM, and LRO software products, was designed and marketed to encourage participating property managers and owners to

accept its algorithmic pricing recommendations. RealPage touted that its clients' compliance with these recommendations would lead to higher overall market rents.

71. By feeding proprietary rent roll and occupancy data into RealPage's system, Defendants provided their competitors with access to otherwise confidential, competitively sensitive information. RealPage aggregated and processed this data to produce pricing recommendations that were shared back to all participating clients, effectively aligning rental prices across the market.

72. This systematic sharing and coordinated acceptance of RealPage's pricing recommendations amounted to a horizontal agreement among competitors to fix rental prices, in violation of Texas law.

73. Defendants' conspiracy harmed competition by suppressing independent pricing decisions, reducing price competition, and inflating rental prices above competitive levels throughout the affected markets, including in Texas metropolitan areas such as Houston, Dallas-Fort Worth, and Austin.

74. The result of this conduct was a substantial increase in rental costs paid by Plaintiffs and the proposed Class members, who were deprived of the benefits of a competitive rental market.

75. The supracompetitive rents charged during the Class Period were not the result of legitimate business justifications, but instead were the direct and intended outcome of Defendants' unlawful agreement to use RealPage's algorithmic pricing tools to coordinate rental rates.

76. These practices have had a continuing adverse effect on competition and consumers, with inflated rental prices persisting in the Texas multifamily housing market during and after the Class Period.

## CAUSES OF ACTION

### COUNT ONE – Violation of the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code § 15.05(a) and (c))

77. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

78. This claim is brought pursuant to the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA"), Tex. Bus. & Com. Code § 15.05(a) and (c), which provides, in relevant part:

79. **Section 15.05(a):** *"Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."*

80. **Section 15.05(c):** "It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods, … for use, consumption, or resale or to fix a price for such use, consumption, or resale or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce."

81. Texas courts recognize that agreements among competitors to fix prices—including agreements to use common algorithms or third-party platforms to coordinate pricing—constitute *per se* violations of TFEAA § 15.05(a) and (c).

82. Management Defendants are among the largest owners, operators, and/or managers of multifamily rental housing in Texas and across the United States.

83. Management Defendants each contracted with and utilized RealPage's revenue management software platform—including YieldStar, AIRM, or LRO—which collects and shares competitively sensitive, nonpublic rental pricing and supply data among participating landlords.

84. Through their coordinated use of RealPage, Defendants entered into an agreement, combination, and conspiracy with one another, facilitated by RealPage, to artificially inflate and maintain rental prices above competitive levels in Texas rental markets.

85. This agreement and combination had the *purpose and effect* of restraining trade and commerce by:

a. Exchanging nonpublic, sensitive pricing and supply data among competitors;

b. Relying on algorithmic pricing recommendations that suppressed price competition;

c. Coordinating rent increases across competing properties; and

d. Eliminating or reducing discounts, concessions, and price negotiations that would have occurred in a competitive market.

86. Defendants' conduct constitutes a *per se* unlawful price-fixing conspiracy under § 15.05(a) and (c), in that they knowingly participated in a horizontal agreement to fix or stabilize rents through a shared algorithmic pricing mechanism rather than through independent competitive decision-making.

87. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class paid higher rental prices than they would have in a competitive market.

88. Pursuant to TFEAA § 15.21, Plaintiffs and the Class seek to recover:

a. Threefold the damages sustained;

b. Reasonable attorneys' fees;

c. Costs of suit; and

d. Injunctive relief prohibiting Defendants from continuing their unlawful conduct.

**COUNT TWO – Civil Conspiracy**

89. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

90. Under Texas law, a civil conspiracy occurs when:

a. Two or more persons;

b. Have an object to be accomplished;

c. Have a meeting of the minds on the object or course of action;

d. Commit one or more unlawful, overt acts in furtherance of the object; and

e. Proximately cause injury to the Plaintiffs.

91. Management Defendants knowingly and willfully conspired and agreed among themselves, and with other co-conspirators, to engage in an unlawful scheme to fix rental housing prices in violation of Tex. Bus. & Com. Code § 15.05(a) and (c), which prohibit agreements among competitors to fix, control, or maintain prices.

92. This agreement was facilitated, implemented, and concealed through the coordinated use of RealPage's revenue management software, which collected, aggregated, and analyzed sensitive nonpublic rental pricing and occupancy data from participating landlords and then generated uniform pricing recommendations designed to maximize rent levels across the market.

93. Defendants each knowingly joined this agreement with the unlawful objective of reducing price competition in the Texas rental housing market, increasing rental prices above competitive levels, and maximizing their own revenues at the expense of tenants.

94. The "meeting of the minds" occurred through Defendants' parallel adoption and use of the RealPage platform, their knowing contribution of proprietary rent and occupancy data,

and their conscious commitment to follow RealPage's coordinated pricing recommendations rather than independently determining rental rates.

95. Overt acts in furtherance of the conspiracy included:

a. Regular and continuous submission of rental pricing and occupancy data to RealPage;

b. Implementation of rent increases recommended by RealPage's algorithms;

c. Reduction or elimination of discounts, concessions, and negotiated rates in line with RealPage's coordinated guidance; and

d. Concealment of the coordinated nature of pricing from tenants and the public.

96. As a direct and proximate result of Defendants' conspiracy, Plaintiffs and members of the Class paid artificially inflated rental prices, lost the ability to negotiate or shop for competitive rates, and suffered economic injury.

97. Defendants' conspiracy was malicious, intentional, and without legal justification, warranting the imposition of exemplary damages under Texas law.

98. Plaintiffs and the Class seek recovery of:

a. Actual damages in an amount to be proven at trial;

b. Exemplary damages for willful and malicious conduct;

c. Costs of court; and

d. Pre- and post-judgment interest at the maximum rate allowed by law.

**COUNT THREE – Fraud by Omission**

99. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

100. Under Texas law, fraud by omission occurs when:

a. The defendant conceals or fails to disclose a material fact within the defendant's knowledge;

b. The defendant knows that the plaintiffs are ignorant of the fact and does not have an equal opportunity to discover it;

c. The defendant intends to induce the plaintiffs to take some action by concealing or failing to disclose the fact; and

d. The plaintiffs suffer injury as a result of acting without knowledge of the undisclosed fact.

101. Management Defendants had superior and exclusive knowledge of the coordinated pricing scheme implemented through RealPage's revenue management software.

102. Defendants intentionally concealed from Plaintiffs and Class members the fact that their rental prices were being set, influenced, or coordinated using RealPage's algorithmic pricing recommendations based on aggregated, nonpublic data from competing landlords. Defendants knew tenants lacked equal access to this information and intentionally concealed it to induce tenants to enter into or renew leases at inflated prices. Plaintiffs and Class members, unaware of this concealed collusion, acted to their detriment by paying rents above competitive levels.

103. Defendants further failed to disclose that:

a. They were sharing sensitive, real-time pricing and occupancy data with competitors through RealPage;

b. They were participating in an agreement among competitors to follow RealPage's coordinated pricing guidance;

c. Discounts, concessions, and negotiated rents were being reduced or eliminated in accordance with RealPage's recommendations; and

d. Such conduct was designed to raise rental prices across the market above competitive levels.

104. Plaintiffs and Class members could not have reasonably discovered these concealed facts through ordinary diligence because Defendants did not publicly disclose their participation in RealPage's program or the nature of the coordinated pricing scheme.

105. Defendants concealed these facts with the intent to induce Plaintiffs and Class members to enter into, renew, or continue rental agreements at prices they would not have agreed to had they known the truth. Plaintiffs and Class members could not have reasonably discovered such facts evidencing Defendants' intent through ordinary diligence because Defendants did not publicly disclose their participation in RealPage's program or the nature of the coordinated pricing scheme.

106. Had Plaintiffs and Class members been aware of the concealed facts, they would have sought alternative housing, negotiated lower rents, or otherwise acted to avoid paying artificially inflated prices.

107. As a direct and proximate result of Defendants' fraud by omission, Plaintiffs and Class members suffered economic damages, including overpayment of rent, loss of the ability to negotiate rent based on true market conditions, and loss of access to competitive rental pricing.

108. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiffs and the Class to exemplary damages under Texas law.

109. Plaintiffs and the Class seek:

a. Actual damages;

b. Exemplary damages;

c. Attorneys' fees and costs; and

d. Pre- and post-judgment interest at the maximum rate allowed by law.

**COUNT FOUR – Unjust Enrichment**

110. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

111. Under Texas law, a person is unjustly enriched when they obtain a benefit from another by fraud, duress, or the taking of an undue advantage, and equity and good conscience require restitution.

112. Defendants knowingly received and retained monetary benefits from Plaintiffs and Class members in the form of inflated rental payments.

113. These inflated payments were the direct and intended result of Defendants' coordinated use of RealPage's revenue management platform to fix, raise, stabilize, and maintain rental prices at supracompetitive levels in violation of Tex. Bus. & Com. Code § 15.05(a) and (c) and other Texas laws.

114. Defendants' scheme involved the deliberate suppression of price competition among competing landlords, which artificially increased the rents charged to Plaintiffs and the Class and deprived them of the ability to secure housing at competitive market rates.

115. By following RealPage's algorithmic pricing recommendations, Defendants were able to charge rents higher than they could have obtained in a fair, competitive market—thereby increasing their revenues at the expense of tenants.

116. The retention of these benefits is unjust because they were obtained through anticompetitive agreements, deception, omissions of material facts, and other wrongful acts, and because Plaintiffs and Class members did not receive the benefit of fair market value in exchange for the rents paid.

117. Equity and good conscience require that Defendants disgorge the ill-gotten gains they obtained through their wrongful conduct and restore such amounts to Plaintiffs and the Class.

118. Plaintiffs and the Class seek:

a. Restitution of all amounts by which Defendants were unjustly enriched;

b. Disgorgement of all ill-gotten gains;

c. Pre- and post-judgment interest at the maximum rate allowed by law; and

d. Attorneys' fees and costs as allowed by law.

**COUNT FIVE – Violation of the Texas Deceptive Trade Practices–
Consumer Protection Act
(Tex. Bus. & Com. Code § 17.46(b)(5), (7), and (12))**

119. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

120. This claim is brought pursuant to the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.46(b). The DTPA provides, in relevant part:

121. **Section 17.46(b):** *"False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division of the attorney general or a consumer as provided in this subchapter."*

122. The following subsections are specifically relevant here:

**§ 17.46(b)(5):** *"Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"*

**§ 17.46(b)(7):** *"Representing that goods or services are of a particular standard, quality, or grade… if they are of another."*

**§ 17.46(b)(12):** *"Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."*

123. Plaintiffs and the Class are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4), in that they sought or acquired by lease "services" (the rental of residential property) for personal, family, or household purposes.

124. Defendants, through their coordinated use of RealPage's revenue management platform, engaged in false, misleading, and deceptive acts or practices in connection with the lease of rental housing, including but not limited to:

a. Failing to disclose that rental rates were being coordinated and fixed through a shared algorithmic platform, depriving tenants of the benefits of a competitive market;

b. Misrepresenting that rental rates were independently determined based on market forces, when in fact they were based on nonpublic shared data and coordinated pricing recommendations;

c. Misrepresenting or omitting the fact that discounts, concessions, or negotiations were restricted or eliminated as a result of participation in the RealPage pricing scheme; and

d. Representing, implicitly or explicitly, that tenants were paying a market-based rate when, in reality, such rates were inflated due to unlawful price-fixing.

125. Defendants' conduct violated § 17.46(b)(5) by representing that the "service" of providing a competitively priced rental unit had characteristics, benefits, and qualities that it did not in fact have.

126. Defendants' conduct violated § 17.46(b)(7) by representing that the rental services were of a "standard, quality, or grade" — i.e., competitively priced and lawfully determined — when they were instead coordinated in violation of Texas antitrust law.

127. Defendants' conduct violated § 17.46(b)(12) by representing that the lease agreements involved lawful pricing obligations, when in fact the obligations were the product of prohibited price-fixing under Texas law.

128. Defendants' omissions and misrepresentations were material and were relied upon by Plaintiffs and the Class in deciding to lease and/or renew their residential tenancies.

129. As a direct and producing cause of Defendants' DTPA violations, Plaintiffs and the Class suffered damages, including but not limited to overpayment for rental housing, loss of the opportunity to negotiate or obtain concessions, and reduced market choice.

130. Pursuant to Tex. Bus. & Com. Code § 17.505(a), Plaintiffs have provided sufficient written notice to Defendants of their claims under DTPA prior to filing this Amended Complaint.

131. Pursuant to Tex. Bus. & Com. Code § 17.50(b), Plaintiffs and the Class seek:

a. Economic damages in an amount to be determined at trial;

b. Treble damages for knowing or intentional violations;

c. Reasonable attorneys' fees and court costs; and

d. Pre- and post-judgment interest at the maximum rate allowed by law.

## RULE 193.7 NOTICE

132. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Defendants are hereby notified that the production by Defendants of any document in response to written discovery authenticates the document for use against Defendants in any pre-trial proceeding or at trial.

133. Plaintiffs reserve all rights under the Texas Rules of Civil Procedure and related law to modify or amend this complaint to include additional claims arising from the same conduct, transactions, and/or occurrences set out in this complaint.

## CONDITIONS PRECEDENT

134. All conditions precedent to Plaintiffs' and the Class Members' right to recover the relief sought herein have occurred, been satisfied, or been waived.

## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

135. Plaintiffs and Class Members seek pre- and post-judgment interest at the maximum rate allowed by law.

## JURY DEMAND

136. Plaintiffs hereby demand a jury trial. The required fee has previously been paid.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendants be cited to appear and answer this lawsuit, and upon the presentation of evidence, judgment be rendered in favor of Plaintiffs and the Class for the full amount of their damages, pre-judgment interest, post-judgment interest, exemplary damages, costs of court, and all other relief at law or in equity to which Plaintiffs and the Class are justly entitled.

Respectfully submitted,

***Filed under protest pursuant to pending Motion to Remand.***

***Plaintiffs expressly reserve all objections to federal jurisdiction and venue***

By: */s/ Robert C. Hilliard*
Robert C. Hilliard
bobh@hilliard-law.com
Alexander E. Hilliard (*pro hac vice forthcoming)*
alex@hilliard-law.com
Benjamin R. O'Connor (*pro hac vice forthcoming)*
boconnor@hilliard-law.com

**HILLIARD LAW**
719 S. Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone No.: 361.882.1612
Facsimile No.: 361.882.3015

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rule of Civil Procedure, the foregoing was served through the Court CM/ECF System, which will send a notice of electronic filing to all counsel of record, on November 7, 2025.

*/s/ Robert C. Hilliard*
Robert C. Hilliard